FILED

04/09/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 27, 2024

**STATE OF TENNESSEE v. MARCUS TERRELL BRADFORD**

**Appeal from the Criminal Court for Bradley County**
**No. 21-CR-495     Andrew M. Freiberg, Judge**

_____

**No. E2023-00922-CCA-R3-CD**
_____

The Defendant, Marcus Terrell Bradford, was convicted by a Bradley County Criminal Court Jury of assault, a Class A misdemeanor; and disorderly conduct, a Class C misdemeanor, and was sentenced by the trial court to consecutive terms of 11 months, 29 days for the assault conviction and 30 days for the disorderly conduct conviction, to be served at 75% in the county jail. On appeal, the Defendant argues that the trial court erred by imposing the maximum sentences for the offenses, by ordering that the sentences run consecutively, and by not allowing any alternative sentencing options. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and MATTHEW J. WILSON, JJ., joined.

Brennan M. Wingerter, Assistant Public Defender, Franklin, Tennessee (on appeal) and J. Abigail Burke Carroll and Paul D. Rush, Assistant Public Defenders, Cleveland, Tennessee (at trial), for the appellant, Marcus Terrell Bradford.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Shari Tayloe, District Attorney General; and Lydia A. Braun and Krista R. Cochran, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# FACTS

This case arises out of the Defendant's March 12, 2021 threatening behavior toward a stranger, Jeff Hunt, who greeted the Defendant as he was walking past the Defendant to enter a Cleveland Circle K convenience store. The angry Defendant began a confrontation with the victim by demanding to know why he was staring at him. The victim replied that he had not been staring, that he was there with his wife and stepdaughter, and that he did not want any trouble. The belligerent Defendant continued to argue and yell and eventually took his shirt off and threw it on the ground in a move that witnesses described as an invitation to fight. When the victim repeated that he did not want any trouble, the Defendant threatened that he was going to kill the victim and the victim's wife and daughter. The Defendant then walked to his vehicle, reached under the driver's seat, and brought out what the victim identified as a gun. Other store patrons heard the Defendant threaten the victim and saw the Defendant appearing to reach for something inside his vehicle but did not see a gun. When one of them yelled out that the police had been called, the Defendant got into his vehicle and left the store. He was subsequently indicted by the Bradley County Grand Jury for the aggravated assault of the victim, possession of a firearm having been previously convicted of the violent felony of attempted second degree murder, and disorderly conduct.

The first evidence presented at the Defendant's May 24, 2023 trial was a stipulation by the parties that the Defendant had previously been convicted of a felony involving violence. The State then presented a total of four witnesses: Jessica Kitts, the manager of the store, who testified that the store did not have outside surveillance cameras at the time of the incident; Mark Jeffrey Tippett, a customer who witnessed the altercation as he was entering and exiting the store; Mr. Tippett's wife, Tansy Tippet, who witnessed the altercation from her vehicle at the gasoline pumps and called 911; and the victim.

Mr. Tippett noticed as he walked into the store that the Defendant was arguing with the victim and the victim's wife, and that the Defendant was being "real aggressive with [the victim]." The argument began inside but continued outside the store, with the men "bickering back and forth a little bit" before the Defendant, who seemed very angry, took his shirt off and said the word "gun" and "I got something for your a**[,]" or words to that effect. Although Mr. Tippett was certain he heard the Defendant say the word "gun," he never saw a gun. However, he was so concerned that he immediately went to his wife, sitting in their vehicle, to tell her to call the police. When he reached her, he learned that she had already called 911.

Mrs. Tippett was at the gasoline pumps sitting in her vehicle with the window down when she heard loud arguing, looked toward the store, and saw the victim's wife helping her disabled daughter walk into the store as the Defendant was "just cussing and raising

- 2 -

Cain."  After the victim's wife and daughter entered the store, Mrs. Tippett did not hear anything for a few minutes, but then "it was back outside[.]"  She saw the victim, the victim's wife and daughter, and the Defendant outside the store.  The Defendant was "pacing around and doing his arms and, and cussing [the victim] and telling him that . . . he had something for him."  The victim was "shaking his head, and . . . saying that he didn't want any trouble and . . . trying to walk on, but the [Defendant] just kind of kept on at him[.]"

As the victim walked toward the victim's vehicle, the Defendant pulled his shirt off, threw it to the ground, and said, "I've got something for you."  Mrs. Tippett thought that the Defendant "was, like, wanting to fight maybe," and it was at that point that she became so alarmed that she called 911.  Based on her observation of the victim's gestures, she thought that the victim, again, indicated to the Defendant that he did not want any trouble.  As she watched, she saw the Defendant walk to his vehicle, open his driver's door, and appear to reach for something inside his vehicle.  Meanwhile, the Defendant's male companion was standing on the passenger side of the Defendant's vehicle shaking his head as he talked to the Defendant.  Because she believed that the Defendant was about to shoot the victim, Mrs. Tippett yelled out to let him know that she had called the police.  The Defendant then got into the driver's side of his vehicle and left the store with his companion.  Mrs. Tippett never saw a gun.

The victim and his wife and stepdaughter were waiting for a pizza they had ordered from a nearby pizza restaurant when the victim's wife pulled their vehicle into the Circle K lot so that the victim could use its restroom.  The Defendant, whom the victim had never seen before, was leaning against the Defendant's vehicle parked near the store's front door.  As the victim walked past the Defendant to enter the store, he greeted the Defendant with, "Hi, how are you doing?"  After using the restroom, he walked out to be immediately confronted by the Defendant "screaming and ranting and raving and why was [the victim] staring anyone down[.]"  The victim replied that he was not staring anyone down, and that he "just had to go to the restroom, dude[.]"

The victim recalled that the Defendant might have pushed him "a little bit" but said it was not a big deal to him at the time.  When asked to describe the Defendant's demeanor, he responded that the Defendant was "absolutely belligerent," "ranting and raving" and "throwing his arms" as if he was "just mad and hated the world[.]"  He never threatened the Defendant but instead kept telling him that he was with his family and did not want any problems.  The Defendant's male companion approached, and the victim repeated that he was with his wife and daughter and did not want any trouble.  The Defendant then "ripped" off his shirt and said, "Well, you should have thought about that before[,]" followed by, "I'll kill you, your wife, and your daughter."

- 3 -

The victim walked to the passenger side of his vehicle to protect his stepdaughter, and the Defendant walked to the driver's side of the Defendant's vehicle, reached underneath the driver's seat, and brought out a gun before taking a couple of steps that hid him from the victim's view. At that point, the victim's wife, who had gone into the store, came outside and called out in a panicky voice that the Defendant had a gun and that the police were on their way. The Defendant then got into his vehicle and left the store with his companion. Moments later, the police arrived.

The victim acknowledged that he was familiar with firearms and had his own gun in the glove box of his vehicle. He denied that he threatened to get his gun or attempted to retrieve it from the glove box. He acknowledged that his conversation with the Defendant got "heated" and that the Defendant's removal of his shirt was "in the quintessential come-fight-me gesture[.]" He conceded that he never saw the Defendant point his gun or wave it in the air. He estimated that he was twenty-five to thirty feet from the Defendant when the Defendant brought out his gun and said he was unable to identify whether it was a "Glock or if it was a Beretta or whatever[,]" despite his fourteen years of experience as an employee of a shooting supply store. He said he was aware that some air pellet and BB guns look like handguns. He could not remember if he told the officers who first interviewed him, that he saw the Defendant with a gun, or his wife's having told the officers that she never saw the gun. He did recall that he testified about seeing the gun during the preliminary hearing.

After the State rested its case, the Defendant moved for judgment of acquittal on the aggravated assault count, arguing that there was no proof of the display of a weapon. The trial court granted the motion in part by reducing the aggravated assault count of the indictment to attempted aggravated assault. The Defendant elected not to testify and did not present any witnesses. During his *Momon* hearing, the Defendant stated that he had been diagnosed with "Bipolar schizophrenia." He said that for the past three years, "[u]p until the time that [he] caught Covid," he had been consistently taking two prescribed mental health medications, which provided him with "an emotional stability" and "clearness of mind" that he might not otherwise possess.

Following deliberations, the jury found the Defendant guilty of the lesser included offense of simple assault in count one, not guilty of possession of a firearm by a convicted felon in count two, and guilty of disorderly conduct as charged in count three. After affirming the jury's verdicts, the trial court discharged the jury and held a sentencing hearing.

Admitted as an exhibit to the sentencing hearing were certified copies of the Defendant's September 14, 2006 McMinn County jury trial convictions for two counts of attempted second degree murder, a Class B felony; and reckless endangerment, a Class A

misdemeanor, for which the Defendant received an effective ten-year sentence at 30% in the Tennessee Department of Correction. Also admitted were certified copies of the Defendant's three misdemeanor drug-related convictions, for which the Defendant received either a fine or a suspended sentence. Defense counsel pointed out that the State had not shown proof of any violations of probation, and argued that the Defendant had demonstrated that "he is very much capable of engaging in probation and successfully completing it." The State, on the other hand, requested "a sentence to serve, an 11-29 at 75 percent."

In determining the appropriate sentences, the trial court noted that the principles of sentencing call for "the least severe measure necessary to achieve justice," a sentence "proportional as a reflection of the conduct[,]" and for the trial court "to foster and encourage alternatives to incarceration that elicit voluntary cooperation of offenders." However, the trial court also noted that there was no presumption that a defendant convicted of a misdemeanor is eligible for an alternative sentence. The trial court expressed "grave concerns about [the Defendant's] fitness for society" given his two prior attempted second degree murder convictions, his "significant mental health issue[,]" and the circumstances of the instant case, in which the Defendant reacted violently without provocation to an imagined slight. The trial court found applicable as an enhancement factor the Defendant's history of criminal behavior and criminal convictions, *see* Tenn. Code Ann. § 40-35-114(1), and that there were no applicable factors in mitigation. The trial court further found that confinement was necessary to protect the public from the Defendant's dangerous behavior, as well as to serve as a "specific deterrence against [the Defendant.]"

With respect to consecutive sentencing, the trial court found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing crimes in which the risk to human life was high. *See id*. at § 40-35-115(b)(4). Addressing the *Wilkerson* factors, the court found that the Defendant's "entire course of action and conduct was that of dangerousness and violence" and that the Defendant's prior convictions for attempted second degree murder demonstrated that it was "just a pattern or conduct that indicate[d] [the Defendant's] willingness to just engage in violence [and], fighting behaviors[.]" The trial court's ruling states in pertinent part:

The *Wilkerson* factors say that there needs to be something tangible. I agree that his entire course of action and conduct was that of dangerousness and violence at bar. I also tangibly find that, since you'd been to prison on a ten-year term for two counts of attempted second degree murder, this is just a pattern of conduct that indicates one's willingness to just engage in violence, fighting behaviors, and I do think that consecutive sentencing of 30 days on top of 11-29 at the maximum 75 percent is proportional. And, quite

honestly, it's just about restraining an individual and trying to shock a conscience that people do not behave like gorillas out in polite society, and it doesn't matter who you are or where you are. Families need gas too. Families just want to go home and eat meals. You don't know these people. You've got no business talking to them.

He's dangerous, and so I find 30 days jail consecutive to 11-29 days jail to be appropriate.

## ANALYSIS

The Defendant contends that the trial court abused its discretion in sentencing because it did not "act in accordance with the principles, purposes, or goals of sentencing when it ordered [the Defendant] to serve the maximum possible sentences, consecutively, in custody." He first argues that the proof does not support the trial court's findings that he engaged in "very dangerous conduct" and qualified as a dangerous offender under the consecutive sentencing statute, asserting that the trial court's description of his "pounding [his] chest like a gorilla" "did not reflect an accurate assessment of the proof." He points out that the jury acquitted him of the gun charge and asserts that the proof, at most, shows only that he verbally threatened the victim while attempting to initiate a physical fight. He next argues that the trial court overemphasized his felony convictions while "neglecting the fact that there was no evidence of [his] failing to comply with any conditions of his prior probationary sentences" in its finding that he had an extensive criminal history. He additionally argues that the trial court's finding that nothing has deterred him from his dangerous conduct was contrary to the proof, presented outside the jury's presence, of his having said just before disengaging from the encounter that he was not "going back to prison for this sh*t." The Defendant argues that his willingness to disengage without physical violence demonstrates that further incarceration is unnecessary as a deterrence. Finally, the Defendant argues that his mental health needs will be best addressed by a sentence of probation.

The State responds that the trial court considered the appropriate sentencing considerations and acted within its broad discretion in sentencing the Defendant. We agree with the State.

A sentence imposed for a misdemeanor offense must be specific and in accordance with the principles, purposes, and goals of the Sentencing Act. Tenn. Code Ann. §§ 40-35-104, -302(b); *State v. Cooper*, 336 S.W.3d 522, 524 (Tenn. 2011); *State v. Palmer*, 902 S.W.2d 391, 394 (Tenn. 1995). The trial court is granted considerable latitude in misdemeanor sentencing, and a defendant convicted of a misdemeanor has no presumption of entitlement to a minimum sentence. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim.

App. 1999) (citations omitted); *see also State v. Lambert*, No. E2018-02882-CCA-R3-CD, 2020 WL 2036651, at *10 (Tenn. Crim. App. Apr. 28, 2020), (noting that a trial court has "considerable flexibility in setting the length and manner of service of the misdemeanor sentence."), *no perm app. filed*. Nor is a defendant convicted of a misdemeanor entitled to a presumption regarding an alternative sentence to incarceration. *State v. Troutman*, 979 S.W. 2d 271, 273 (Tenn. 1998) (citation omitted). The defendant bears the burden of proving that the sentence is improper. *id*. § 40-35-401, Sentencing Comm'n Cmts. This court has held that the abuse of discretion with a presumption of reasonableness standard of review announced in *State v. Bise*, 380 S.W. 682, 707 (Tenn. 2012), applies to our review of misdemeanor sentencing determinations. *See, e.g., Lambert*, 2020 WL 2036651, at *10; *State v. Miller*, No. M2019-00214-CCA-R3-CD, 2020 WL 526094, at *12 (Tenn. Crim. App. Feb. 3, 2020), *no perm. app. filed*; *State v. Hampton*, No. W2018-00623-CCA-R3-CD, 2019 WL 1167807, at *12 (Tenn. Crim. App. Mar. 12, 2019), *no perm. app. filed*. "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1). In addition, "[t]he sentence imposed should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" *Id.* at § 40-35-103(2), (4).

A trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that any one of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including the one that the trial court found to be applicable in this case: the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. *See Id*. § 40-35-115(b)(4). When the court bases consecutive

sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995). We review the trial court's order of consecutive sentencing under the same *Bise* abuse of discretion with a presumption of reasonableness standard by which we review its other sentencing determinations. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013).

We first address the Defendant's contention that the trial court's findings did not reflect an accurate assessment of the proof. In his reply brief, the Defendant faults the State for not addressing the "zoomorphism that permeated the trial court's reasons for ordering [the Defendant] to serve maximum consecutive sentences in confinement." Citing the trial court's comparison of the Defendant's ripping off his shirt to a gorilla's territorial beating of its chest, the Defendant argues that "the State, like the trial court, has exaggerated the circumstances of this case in an attempt to shore up the conclusion that [the Defendant] is a 'dangerous offender' deserving of consecutive sentences."

We respectfully disagree that either the State or the trial court exaggerated the circumstances of the case. Regardless of the Defendant's acquittal on the gun charge, the proof at trial showed that the Defendant became enraged at an imagined slight by the victim, aggressively confronted him, ripped off his shirt in a move that witnesses described as an invitation to fight, threatened to kill the victim and the victim's family when the victim repeated that he wanted no trouble, announced that he had something for the victim's "a\*\*," and went to his vehicle to retrieve what the victim saw to be a gun. Another store patron was so alarmed by the victim's behavior that she called 911. That same store patron testified that, although she never saw a gun, she saw the Defendant retrieve something from his vehicle and was prompted to alert the Defendant of her call to the police by her belief that the Defendant was about to shoot the victim. It was only then that the Defendant disengaged and left the store. Thus, although we in no way condone the trial court's comparison of the Defendant's actions to those of a gorilla, we conclude that the circumstances support the trial court's finding that the Defendant was a dangerous offender.

In his reply brief, the Defendant also complains of the State's failure to address *State v. Flippo*, No. M2006-01182-CCA-R3-CD, 2007 WL 1628868 (Tenn. Crim. App. June 6, 2007), which he cited in his principal brief in support of his contention that the trial court improperly classified the Defendant as a dangerous offender. The defendant in that case was convicted of two counts of attempted aggravated assault based on his actions of pointing his gun at a man and his son during a roadside altercation. *Id.* at \*1-2. The trial court sentenced the defendant to three years and three years and six months, respectively,

and ordered that the sentences be served consecutively based on its finding that the defendant was a dangerous offender. Reviewing the order of consecutive sentencing *de novo* due to the trial court's failure to address the *Wilkerson* factors, this Court concluded that the record did not support consecutive sentencing under the dangerous offender classification because the crime of attempted aggravated assault is inherently dangerous and "[t]he circumstances surrounding this crime are not aggravated beyond that generally occurring in crimes of this nature." *Id.* at *13.

The circumstances in *Flippo* are distinguishable from those of the case at bar. Unlike the defendant and the victim in *Flippo*, who had a history of animosity and a prior contentious roadside encounter, *id.* at *2-5, the victim was a complete stranger to the Defendant and did nothing to warrant the Defendant's outrageous reaction. Moreover, unlike the defendant in *Flippo*, who had no felony record, the Defendant has two prior felony convictions for attempted second degree murder. We disagree with the Defendant's claim that his disengagement from the altercation following his statement that he was not about to go back to prison demonstrates that he was already sufficiently deterred from violence by his prior incarceration. Given that the Defendant did not disengage until he learned that the police were on their way, the proof suggests that the Defendant was deterred from physical violence by his fear of immediate arrest, and not that his prior incarceration deterred him from engaging in violent behavior.

The record reflects that the trial court appropriately considered the evidence and the principles and purposes of sentencing, based its classification of the Defendant as a dangerous offender on the facts and circumstances surrounding the case, and made the appropriate *Wilkerson* findings. Accordingly, we conclude that the trial court acted within its discretion in its sentencing determinations, and we affirm the sentences as imposed by the trial court.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE